UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

ROBERT LEE BROXTON,

     Plaintiff,

                                  Case No.:  1:21-cv-174

v.

MAZDA MOTOR CORPORATION
and MAZDA MOTOR OF AMERICA,
INC.,

     Defendants.

---

## COMPLAINT

---

Plaintiff, Robert Lee Broxton, through his undersigned counsel, hereby sues Defendants, Mazda Motor Corporation and Mazda Motor of America, Inc., for the claims for relief stated herein.

## SUMMARY OF THE ACTION

1. Plaintiff, Robert Lee Broxton ("Broxton"), brings this action to recover for the severe, permanent, and life-altering injuries he suffered when the Takata airbag inflator installed in his 2004 Mazda 6S (VIN #1YVFP80D945N83808) (the "Subject Vehicle") exploded and shot metal shrapnel into his body during a vehicular collision on November 12, 2019.

2. Following an investigation of the incident, it was discovered that Defendants, Mazda Motor Corporation and Mazda Motor of America, Inc. (sometimes referred to herein collectively as "Mazda" or "the Mazda Defendants"), are responsible for procuring and installing the exploding Takata airbag inflator that caused Broxton's injuries and that the Takata airbag inflator is defective and unreasonably dangerous.

3.     Astonishingly, it was further discovered that Mazda knew about the Takata airbag inflator's defectively dangerous condition for years prior to the incident that forms the basis of this lawsuit. Eventually—after years of mounting scrutiny and scores of Takata-airbag linked deaths and wounding incidents—Mazda began unduly narrow, wholly inadequate recall efforts to replace the defective Takata airbag inflators inside Mazda-branded vehicles.

4.     Even when Mazda expanded recall efforts from 2014 and 2017, it failed to recall Broxton's vehicle despite knowledge that it contained the dangerous Takata airbag inflators. And when Mazda finally announced a recall that included Broxton's vehicle in 2017 and 2018, Mazda negligently carried out its recall campaign by failing to notify Broxton of the recall.

5.     Mazda is directly responsible for Broxton's injuries that were caused by the explosion of the inflator incorporated into the airbag safety system (herein referred to as the "Takata airbag," "Defective Airbag(s)," "airbag safety system," "Airbag Safety System," "airbag system," "safety system," or "airbag").

6.     The following are accurate photographs depicting some of the injuries Broxton suffered as a result of the Incident, in addition to the airbag post-deployment, shredded by shrapnel launched from the ruptured inflator:





**THE PARTIES, JURISDICTION & VENUE**

7.      At all times material hereto, Broxton is a Texas citizen, resident, and domiciliary.

8.      At all times material hereto, Mazda Motor Corporation is a Japanese corporation with its principal place of business located in Japan.

9.     The Court is authorized to exercise personal jurisdiction over Mazda Motor Corporation.

10.     At all times material hereto, Mazda Motor of America, Inc. is a California corporation with its principal place of business located in California.

11.     The Court is authorized to exercise personal jurisdiction over Mazda Motor of America, Inc.

12.     This Court has personal jurisdiction over each of the Mazda Defendants pursuant to the Texas Long-Arm Statute, Texas Civil Practice and Remedies Code §§ 17.0421–.045, because they conduct substantial business in Texas; and Broxton's claims arise out of the Mazda Defendants committing a tort in whole or in part in the State of Texas.

13.     The Mazda Defendants are engaged in the business of designing, manufacturing, testing, and selling vehicles which are distributed and sold throughout the United States and Texas specifically. The Mazda Defendants have purposefully availed themselves of the privileges, benefits, and protections of doing business in the state of Texas in a meaningful way, and have sufficient minimum contacts to justify being subject to the jurisdiction of this Court.

14.     The Mazda Defendants submitted themselves to the jurisdiction of this Honorable Court by doing, personally or through agents, at all times material to this cause of action, the following acts:

    a.     Committing a tortious act within this state by selling and delivering defective vehicles, including Mazda 6S vehicles, to persons, firms, or corporations in this state via its distributors, dealers, wholesalers, and brokers. Such Mazda Defendants' vehicles were used by consumers in Texas in the ordinary course of commerce and trade;

    b.     Conducting and engaging in substantial business and other activities in Texas by selling and servicing Mazda Defendants' vehicles and component parts to persons, firms, or corporations in this state via their distributors, wholesalers, dealers, and brokers. Such Mazda

Defendants vehicles were used by consumers in Texas in the ordinary course of commerce and trade;

c.      The acts or omissions of the Mazda Defendants, caused injuries to persons, including Broxton. At or about the time of said injuries, Defendants engaged in solicitation activities in Texas to purposefully promote the sale, consumption, and use of Mazda vehicles, including the Mazda 6S which is the subject of this Complaint;

d.      Selling Mazda Defendants' vehicles and component parts, including the Mazda 6S which is the subject of this Complaint, with knowledge or reason to foresee that their Mazda vehicles would be shipped in interstate commerce and would reach the market of Texas users or consumers;

e.      The claims against the Mazda Defendants are linked, related, and/or arise out of the Mazda Defendants' conduct;

f.      The Mazda Defendants' contacts with Texas relate to the recall of vehicles and all of the conduct associated with such vehicle recalls and this civil action is related to and connected with the recall of its vehicles;

g.      Due process and fair play and substantial justice are honored by this civil action going forward in this Texas Court;

h.      There is little or no burden on Mazda Defendants litigating this case in this Texas Court;

i.      It would be a tremendous burden and great inefficiency and unnecessary delay imposed on Broxton to litigate this case in another forum;

j.      Texas has an interest in overseeing this litigation which involves injuries to a Texas resident and tortious transactions which occurred in Texas and defective products sold in Texas;

k.      Public policy favors resolution of this dispute in this Texas Court;

l.      The Mazda Defendants' conduct and connection with Texas are such that Mazda Defendants should reasonably anticipate being haled into court in Texas.

15.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because Broxton is a citizen of Texas, Mazda Motor Corporation is a citizen of Japan, Mazda Motor of America, Inc. is a citizen of California, and the amount in controversy exceeds $75,000.

16.     Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims occurred in the Western District of Texas.

## FACTUAL ALLEGATIONS

### A.      The Subject Incident

17.     The Mazda Defendants are in the business of and derive substantial profit from designing, engineering, manufacturing, assembling, producing, inspecting, testing, distributing, and selling a wide range of motor vehicles for consumer use and from procuring and installing the many component parts that go into manufacturing these motor vehicles.

18.     Mazda vehicles sold in the United States, including Broxton's vehicle, contain defective Takata airbags. The Mazda Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Texas.

19.     The Mazda Defendants designed, engineered, manufactured, assembled, produced, inspected, tested, distributed, and sold the Subject Vehicle and procured and installed many component parts used to produce the Subject Vehicle, including the Subject Vehicle's airbags, airbag inflators, and airbag systems.

20.     On November 12, 2019, Broxton was driving the Subject Vehicle when he was involved in an automobile accident within the Western District of Texas. Broxton was driving normally when the vehicle in front of him slowed for traffic, which Broxton could not see because of glare from the sun, causing Broxton to rear end the vehicle he was following—while

operating at a speed within the posted limits (the "Incident"). The Incident, which forms the basis of this Complaint, arises out of ordinary use of the Subject Vehicle at the time.

21.     At the time of the Incident, the Subject Vehicle and its component sub-assemblies at issue in this action were in the same essential condition as they were at the time that they left the Mazda Defendants' control.

22.     The Incident triggered the deployment of the Subject Vehicle's airbag safety system that was designed and manufactured to provide protection from injuries in such foreseeable type of crashes. However, instead of providing such protection as intended, the airbag system <u>failed</u>. The inflator of the airbag safety system ruptured and exploded upon deployment in this crash—shooting multiple metal fragments of the airbag safety system and causing Broxton to be struck violently in the head and hands at high velocity.

23.     The injuries sustained by Broxton, would not have occurred but for the Mazda Defendants' failure to reasonably perform the recalls they endeavored to perform in order to mitigate the danger posed by the Subject Vehicle's Takata airbag system. The Mazda Defendants' woefully inadequate, negligent recall prevented a normal, safe, and expected airbag deployment in the Subject Vehicle at the time of the Incident and instead caused shrapnel to expel from the frontal airbag that seriously injured Broxton.

**B.     Background of Takata**

24.     Takata Corporation, Takata, Inc., and TK Holdings, Inc. (referred to herein collectively as "Takata") participated in the design, manufacture, supply, and distribution of airbags, airbag systems, and airbag component parts, including airbag inflators.

25.     Until recently, Takata was the world's second largest manufacturer of automotive safety devices, including airbags. Takata had a fully integrated development, design, and

manufacturing system for its airbags. Takata made the entire airbag system, including the collision sensing devices, airbag control units, airbag modules, airbag inflators, and airbag cushion materials.

26.     Takata has supplied airbags, airbag systems, and airbag component parts to automakers for U.S. vehicles and to state and local government purchasers since at least 1983. Airbags manufactured by Takata have been installed in millions of vehicles in the United States manufactured by at least ten different automakers, including **Mazda**, Honda, Toyota, Mitsubishi, Nissan, Subaru, Chrysler, Ford, General Motors and BMW. By 2014, Takata captured 22 percent of the global automotive airbag market.

### C.      How Takata's Airbags Work

27.     The driver-side airbag is located in the center part of a vehicle's steering wheel and is stored inside the steering wheel cover. The passenger-side airbag is typically located above the glove compartment and beneath the dashboard. When a collision occurs, the airbag breaks through a "tear-seam" on the back side of the steering wheel cover or back side of the dashboard as it inflates to protect the front seat occupants.

28.     When collision sensors in the vehicle detect a collision, a signal is sent to the airbag control unit. The signal sent from the sensors to the airbag control unit is processed, and the airbag control unit determines the severity of the impact based on the inputted data. If the airbag control unit determines that an airbag deployment is necessary, it sends a signal to initiate the airbag inflator.

29.     The airbag inflator consists of two components encased in a metal canister: (1) a propellant, and (2) an ignitor. The propellant is pressed into wafers or pellets and is encased in a metal canister. The ignition of the propellant causes an explosive chemical reaction that emits

gas, resulting in the rapid inflation and deployment of the airbag cushion. The following basic illustration depicts Takata's airbag module:



30.     As the force of the collision reaches the driver or passenger, they begin to move forward. By this time, the airbags should be fully inflated and ready to receive and restrain the forward movement of the passengers. The airbag is meant to inflate in a timely fashion in a collision, but only with the force necessary to cushion the occupant from the vehicle's interior.

### D.     The Takata Airbag Defect

31.     When it began manufacturing airbags in the 1980s, Takata used a compound called sodium azide as the propellant within its inflators.

32.     Takata redesigned its airbags in the late 1990s for the ostensible purpose of making them more compact and reducing toxic fumes earlier models emitted when deployed.

33.     In the mid-1990s, Takata began using a different propellant called 5-aminotetrazole, in part due to toxicity issues associated with sodium azide.

34.     In the late-1990s, Takata's managers pressured its engineers in Michigan to devise a lower cost propellant based upon ammonium nitrate, a compound commonly used in fertilizer and explosives.

35.     Ammonium nitrate is a dangerous material that should not be used in airbags. It is an inherently volatile and unstable chemical. Temperature changes as minimal as daily

temperature swings are large enough for the ammonium nitrate to cycle through three of its five crystalline states, adding to its volatility. It also readily absorbs moisture from the atmosphere. The chemical's sensitivity to temperature fluctuations and moisture cause it to break down over time, which in turn results in violent detonation or the chemical becoming effectively inert. As one explosives expert bluntly stated in *The New York Times*, ammonium nitrate "shouldn't be used in airbags," and is better suited to large demolitions in mining and construction.

36.     From the time it began investigating ammonium nitrate in the late 1990s, Takata understood these risks. Indeed, Takata expressed concern in a patent document in 1995 that an ammonium nitrate propellant would be vulnerable to temperature changes and that its casing "might even blow up." Takata further recognized that "[o]ne of the major problems with the use of ammonium nitrate is that it undergoes several crystalline phase changes," one of which occurs at approximately 90 degrees Fahrenheit. If ammonium nitrate undergoes this type of temperature change, the compound may "expand and contract and change shape resulting in growth and cracking" of the propellant, which might cause an airbag inflator to "not operate properly or might even blow up because of the excess pressure generated."

37.     Additionally, Takata admitted in a patent document from 1999 that pure ammonium nitrate is "**problematic**" because many gas generating compositions made with it are "**thermally unstable**."

38.     In 1999, as the ammonium nitrate design was being considered, Takata's engineering team in Moses Lake, Michigan, raised objections and pointed to explosives manuals that warned of the risk of disintegration and irregular, overly-energetic combustion. As one former Takata engineer told a reporter, "ammonium nitrate stuck out like a sore thumb," and yet his team was given only "a couple days" to do its review.

39.     Not surprisingly, other major airbag manufacturers, including Autoliv, Key Safety Systems, and TRW Automotive, have reportedly avoided using ammonium nitrate as a propellant.

40.     The only conceivable advantage to the compound for an airbag manufacturer, according to the expert quoted in *The New York Times*, is that it is "cheap, unbelievably cheap." Indeed, Takata had originally planned to use tetrazole as its propellant, which was not only more stable than ammonium nitrate, but also yields other desired benefits, such as being more environmentally friendly. But tetrazole was too expensive for Takata, as executives ultimately pressured engineers in Michigan to develop a cheaper alternative.

41.     As discussed more fully herein, Takata's initial analyses and commentary warning against the use of ammonium nitrate in its airbags ultimately came true; it was soon discovered that Takata's airbags suffered from a defect that caused them to explode violently during the course of a vehicular collision and shoot metal shrapnel toward drivers and occupants of the vehicles in which Takata's airbags were installed (hereinafter referred to as the "Inflator Defect").

### E.     Knowledge of the Airbag Defects by Takata and the Automotive Industry

42.     Takata began receiving complaints regarding the Inflator Defect shortly after introducing the redesigned airbag to the market, and those complaints continued to multiply over the years. Nevertheless, rather than switch to a compound it knew would be safer, even if more expensive, Takata recklessly opted to try, over the course of many years, to stabilize a compound that chemically resists stabilization.

43.     For example, in a 2006 patent application, Takata discussed the need to test the performance of ammonium nitrate at various extreme temperatures because it is an **unstable**

**chemical**, and these tests could reveal many problems, including "**over-pressurization of the inflator leading to rupture**." The 2006 patent document purportedly contained a fix for that sort of rupturing.

44.     Notably, the alleged fix in 2006 came *after* a rupture incident in 2004 that caused an injury, and incidents continued to mount after that time as well. Takata submitted a patent application with purported fixes as recently as 2013. These ongoing, albeit unsuccessful, efforts show that Takata knew its design was problematic.

45.     Takata's airbag manufacturing operations were acutely aware of the defects plaguing Takata airbags. Takata experienced persistent and glaring quality control problems it encountered in its manufacturing operations. The Takata plants that manufactured the airbags at issue include the plants located in Moses Lake, Washington, LaGrange, Georgia, and Monclova, Mexico. These plants also manufacture airbag inflators.

46.     At a House hearing in December 2014, Hiroshi Shimizu, Takata's Senior Vice President for Global Quality Assurance, admitted: "We considered it a main contribution to the problem is [sic] the high temperature and absolute humidity, together with age of the products and probably maybe a combination with manufacturing issues." Nonetheless, Mr. Shimizu claimed that Takata still had not determined the root cause of the defect: "At this moment, we don't have the root cause. We know the factors may contribute to this problems [sic], so that is why we are still researching these inflators collected from regions." Executive Vice President of Honda North America, Rick Schostek, echoed that point at the House hearing: "we have theories, but we don't know the cause . . . ."

47.     Mr. Shimizu grossly understated the problem. Starting in 2001, engineers at the Monclova, Mexico plant identified a range of problems, including faulty welding and rust, which

they said could have caused inflators to fail. Between 2001 and 2003, Takata struggled with at least 45 different inflator problems, according to dozens of internal reports titled "potential failures" and reviewed by *Reuters.*

48.     On at least three occasions between 2005 and 2006, Takata engineers struggled to eliminate leaks found in inflators, according to engineering presentations. In 2005, Shainin, a U.S. consulting firm, found a pattern of additional problems. Underscoring Takata's reckless use of ammonium nitrate, on March 31, 2006, the Monclova, Mexico plant was rocked by violent explosions in containers loaded with propellant, leaving at least a dozen workers injured.

49.     Apparently, not even that terrible accident could prompt serious and lasting improvements. In a February 2007 email to multiple colleagues, one manager stated that "[t]he whole situation makes me sick," referring to Takata's failure to implement checks it had introduced to try to keep the airbags from failing.

50.     Takata engineers also scrambled as late as 2009 to address its propellant issues after "inflators tested from multiple propellant lots showed aggressive ballistics," according to an internal presentation in June 2009.

51.     Based on internal Takata documents, Takata was struggling to meet a surge in demand for its airbags. Putting profits ahead of safety, Takata exhibited shoddy and reckless behavior in the handling of its ammonium nitrate propellant. In March 2011, a Takata supervisor at the Monclova plant sent an e-mail to other employees stating: "A part that is not welded = one life less, which shows we are not fulfilling the mission." The title of the e-mail was *"Defectos y defectos y defectos!!!!"* This shoddy and reckless attitude permeated all of Takata's operations and facilities.

52.     Yet, problems at Takata facilities persisted: another manager urged employees to examine the propellant visible in a cross section of an airbag inflator, noting that"[t]he propellant arrangement inside is what can be damaged when the airbags are dropped . . . . Here you can see why it is important to handle our product properly." A 2009 presentation of guidelines on handling inflators and airbag units also stressed the dangers of mishandling them. The presentation included a link to a video that appeared to show side-curtain airbags deploying violently, sending the inflator hurtling into the car's cabin. (The inflator itself does not rupture in that video.)

53.     Despite knowing it was shipping potentially deadly products, Takata resisted taking back damaged or wet airbag modules, in part because Takata struggled to keep up with a surge in demand for its airbags through the early and mid-2000s as it won big new clients like General Motors and Mazda.

54.     Honda was among the first automakers to use Takata's new air bags, and installed them in some models beginning in 1998. Since then, Takata airbags have been installed in vehicles manufactured by at least ten automakers.

55.     On November 1, 2003, Charlene Weaver of Arizona—one of the least humid states in the country—was a passenger in a 2004 Subaru Impreza when she was killed in a Takata airbag-related accident. As summarized in a later section of this Complaint, her car was not recalled until July 2014, more than a decade later.

56.     In 2003, an inflator ruptured in a BMW, prompting a January 2004 investigation by Takata and BMW. That investigation took place at Takata's LaGrange, Georgia, facility, and involved an inflator sold to BMW, Honda, and Toyota. The testing was ordered by a senior Takata executive, and the results indicated improper welding and incorrect installation of

chemical propellant wafers.

57.     In 2004, a Takata airbag violently exploded in a Honda Accord in Alabama, shooting out metal fragments and injuring the car's driver. Honda was notified of the incident, and at least one Takata employee recalls being told that Honda examined the part before turning it over to Takata. Takata reported back to Honda that it was unable to find a cause for the incident. Ultimately, the companies deemed the incident "an anomaly," and conducted no further investigation or analysis to the public's knowledge. Notably, Honda and Takata did not issue a recall or even involve federal safety regulators beyond completing a reporting form in a cursory and incomplete manner.

58.     Yet, by this time, Takata was aware of the broad problems associated with its choice of unstable and dangerous ammonium nitrate as a propellant. As noted above, between 2001 and 2003, internal Takata reports titled "potential failures" showed that Takata struggled with at least **45 different inflator problems**, and that, in 2002, the Monclova plant recorded 60 to 80 defects for every million inflators shipped to automakers—six to eight times beyond Takata's quality control limit. In light of this accumulated knowledge, Takata's dismissal of the explosion as an anomaly without further study was reckless at best.

59.     Even as it downplayed the incident publicly, engineers at Takata's American headquarters in Auburn Hills, Michigan, began conducting secret tests on 50 airbags it had retrieved from scrapyards. The tests were conducted by Al Bernat, Takata's then-vice president of engineering, and took place over weekends and holidays during the summer of 2004. Steel inflators in at least two of the airbags cracked during the tests, a condition which can lead to rupture. Takata engineers theorized that welding problems made the inflator vulnerable to splitting and rupturing. The result was so startling that engineers began designing possible fixes

in anticipation of a recall.

60. But Takata executives discounted the 2004 test results and shockingly, <u>ordered the lab technicians to delete the test data from company computers and to dispose of the airbag inflators</u>. Prototypes of design alternatives were also trashed. One former Takata employee stated that "[a]ll the testing was hush-hush . . . . Then one day, it was, 'Pack it all up, shut the whole thing down.' It was not standard procedure."

61. Takata did not disclose these tests and continues to deny they occurred. In regulatory filings, Takata has stated instead that it began testing Defective Airbags in 2008. Because Honda and Takata agreed to describe the 2004 incident in Alabama as an "anomaly," and because Honda and Takata were communicating about the defective inflators by 2004, it appears Honda was aware of Takata's secret testing that occurred shortly after the Honda airbag explosion.

62. In June and August of 2007, Honda notified Takata of three additional airbag explosion incidents. All three accidents involved metal fragments propelling into the faces and bodies of car passengers upon deployment of the airbags. As with the 2004 incident, Honda did not initiate a recall or provide information about the ruptures to federal investigators. Rather, it callously risked vehicle occupants' safety as it awaited a failure mode analysis being conducted by Takata.

63. After the 2007 incidents, Honda and Takata began another internal investigation, including a survey of inflators. Starting in late 2007 or early 2008, Honda began collecting inflators returned to dealers for reasons unrelated to the exploding-airbag defect, and sent them to Takata for investigation, all without informing vehicle owners or regulators. Honda also collected inflators from scrap yards for the same purpose.

64.     Takata began what became a year-long study of the Inflator Defect. Takata's engineers ultimately concluded that workers at a Takata factory in Monclova, Mexico, had left out moisture-sensitive explosives on the plant floor, making them prone to overly energetic combustion. Takata advised Honda that by November 2002, it had corrected any such handling deficiencies.

65.     The victims of the four Honda incidents - one in 2004 and three in 2007 - brought legal claims against Honda, which the automaker settled on a strictly confidential basis. While Honda filed a standard report with U.S. safety regulators for each of these four incidents, its reports tellingly omitted the most critical detail of these incidents: the Defective Airbags posed a substantial risk of serious injury or death when deployed. In later submissions to NHTSA, Honda admitted that it had received still other complaints in this timeframe:

     a.  On July 25, 2008, Honda received an unidentified complaint related to Takata driver airbag ruptures.

     b.  On September 11, 2008, Honda received notice of a complaint regarding "unusual" driver airbag deployment.

66.     Takata shared the results of the inflator survey analysis with Honda on October 2, 2008. That analysis indicated an airbag inflator problem. Honda and Takata concluded, however, that only a "small number" of inflators were affected.

67.     As a result, Honda issued a recall, but only for 3,940 vehicles in the United States. This November 2008 recall involved certain 2001 Honda Accord and Civic vehicles with airbags that "could produce excessive internal pressure," causing "the inflator to rupture," spraying metal fragments through the airbag cushion ("2008 Recall"). Honda reported that it learned of the problem from a June 2007 claim, and assured regulators that it had identified all "possible

vehicles that could potentially experience the problem."

68.     Even as Takata and Honda advocated a minuscule recall focused on older models—less than 0.1 percent of the total Honda recall to date—at about the same time, in April 2009, Takata engineers scrambled to repair a flaw in a machine at the Monclova, Mexico, factory that made the airbag propellant more volatile, according to materials from a company presentation given that year.

69.     Additional incidents took place after the 2008 Recall that underscored its inadequacy:

   a.   On April 27, 2009, six months after the limited 2008 recall, a Takata airbag in Jennifer Griffin's 2001 Honda Civic exploded after a minor accident in Orlando, Florida. The explosion sent a two-inch piece of shrapnel from the Defective Airbag flying into Ms. Griffin's neck. Although Ms. Griffin survived, when highway troopers found her, she suffered serious injury to her neck. Ms. Griffin's car was not part of the 2008 Recall. Honda received notice of the incident no later than September 2009, and likely months earlier in July towards the beginning of its correspondence with NHTSA regarding the upcoming 2009 recall.

   b.   On May 28, 2009, 18-year-old Ashley Parham of Oklahoma was killed while driving a 2001 Honda Accord when the Takata airbag in her car exploded after her car bumped another car in a parking lot. While she apparently survived the accident itself, the metal shrapnel that shot out of the exploding Defective Airbag sliced open her carotid artery and she bled to death. Ms. Parham's car was not part of the 2008 Recall.

   c.   Another Takata airbag-related incident took place in Virginia on June 9, 2009,

and Honda ultimately settled a lawsuit brought by the decedent's family.

    d.    According to one of its submissions related to the upcoming 2009 Recall, Honda received three additional Takata airbag unusual deployment complaints on July 27, July 31, and August 31, 2009.

70.    With incidents mounting, Takata and Honda revisited the issue yet again. In June 2009, Takata reported to Honda that the defective airbag components had been made at its factory in Moses Lake, Washington. At the time, Takata engineers explained to Honda that between 2000 and 2002, a flaw in a machine that presses air bag explosives into wafers had made the explosives unstable. The Takata engineers further explained to Honda that with the defective air bags, explosives in the metal inflator, which would normally burn down and produce the nitrogen gas to inflate the air bag, instead burn aggressively and cause the inflator to burst, shooting hot fragments through the air bag's fabric.

71.    After two years of investigation, Honda and Takata found that a machine at Takata's Moses Lake factory in Washington state had failed to compress chemicals firmly enough. That left the inflators vulnerable to moisture, potentially causing the bags to inflate more forcefully than they were supposed to. At that time, Takata also acknowledged that the defect covered a wider range of vehicles than initially estimated, but claimed that the plant had made numerous upgrades to its machinery in late 2002, which it thought had improved the quality of its explosives.

72.    In June 2009, Takata provided a follow up report to Honda on its November 2008 analysis, stating that issues related to propellant production appeared to have caused the improper inflator performance.

73.     As a result of Takata's June 2009 follow-up report and the additional claims of "unusual deployments," on June 30, 2009, Honda issued another recall, this one covering 2001 and 2002 Civic, Accord, and Acura vehicles ("2009 Recall"). Thus, it was only two months *after* Ms. Parham's death that Honda expanded its 2008 Recall to include the model she drove.

74.     In August 2009, NHTSA's Recall Management Division sent Honda an information request to explain why it did not include 2009 Recall vehicles in the 2008 Recall, and "to evaluate the timeliness of [Honda's] recent defect decision."

75.     NHTSA also wanted to know "the difference between the driver's airbag inflators in those vehicles from the inflators in the 09V-259 vehicles and explain how this distinction, or any other between the two sets of vehicles, convinced Honda at the time that it did not need to include the latter set in the 08V-593 recall population."

76.     NHTSA's Recall Management Division further requested that Honda provide complaints, lawsuits, warranty claims, and field reports, along with an explanation of the "unusual driver airbag deployments" and Honda's investigative efforts.

77.     In Honda's September 16, 2009 reply to NHTSA, the automaker said that its information about the "unusual driver airbag deployments" came from Takata: "[w]e understood the causal factors to be related to airbag propellant due to handling of the propellant during airbag inflator module assembly."

78.     Honda also reported, based on information from Takata, that the problem with the airbags was isolated to the "production of the airbag propellant prior to assembly of the inflators" Specifically, the cause was "related to the process of pressing the propellant into wafers that were later installed into the inflator modules," and limited to "a specific production process" involving one high-precision compression press that was used to form the propellant into wafers,

the automaker told NHTSA.

79.     Honda also disclosed to NHTSA that it had fielded nine complaints and one lawsuit related to the 2008 and 2009 Recalls. Honda also finally informed NHTSA about the 2004 incident involving an "unusual deployment" of the vehicle's airbag. Honda claimed that it "only recently [was] reminded of this incident," and that, until recently, Honda "had not associated it with the [2008 Recall] campaign."

80.     Through a November 20, 2009 request, NHTSA also sought information from Takata. Takata submitted a partial response to NHTSA on December 23, 2009 ("Partial Response"), and then a full response on February 19, 2010 ("Full Response"). Both responses provided vague and misleading information about the seriousness of the problem. Takata asserted that there were no substantive design differences between the inflators in the airbags at issue in the two recalls, but cited differences in the production processes between the lots.

81.     Takata also asserted that the defects only existed in specific lots manufactured between certain dates. It claimed that the inflators involved in the 2008 Recall were manufactured between October 29, 2000 and December 1, 2000, and that inflators involved in the 2009 Recall were manufactured between August 23, 2000 and February 25, 2001. Takata did not provide the dates the inflators were shipped, as NHTSA requested, because, as Takata admitted, it did not have that information. Instead, it gave just the manufacturing dates. In its Full Response, Takata asserted that the defect identified in the 2009 Recall was the result of a single compression press (the "Stokes press") in a single plant. Takata further asserted that while it did manufacture 2,400 inflators using the same process as the defective inflators, the design was different and "[t]herefore, Takata is convinced that the inflators sold [redacted] contain no safety-related defect."

82.     Takata wrote in its Full Response that it "believed - [redacted] - that expanding the recall to include all vehicles equipped with inflators manufactured with Stokes propellant produced through and including February 28, 2001 would capture all inflators with tablets that had a risk of producing overly energetic (or aggressive) combustion. This recommendation, as well as the analysis that supported it, was presented to Honda on June 12, 2009."

83.     In both the Partial Response and the Full Response, Takata stated: "Takata has not provided any airbag inflators that are the same or substantially similar to the inflators in vehicles covered by Recalls 08V-593 [in 2008] and 09V-259 [in 2009] to any customers other than Honda. The physical characteristics of the inflator housing used in the Honda vehicles subject to these recalls are unique to Honda." This statement would prove to be false.

84.     On May 6, 2010, NHTSA closed its investigation into the Takata airbags.

85.     In the months following NHTSA's 2009/2010 request for information, Takata engineers came up with yet another explanation for the ruptures; specifically, that in September 2001, machine operators at the Moses Lake plant could have inadvertently switched off an "auto reject" function that weeded out poorly made explosives that can become unstable. However, Takata assured Honda at the time that, "as part of the upgrades at that plant, in September 2002, the supplier had added a locking mechanism that prevented workers from turning the auto-reject function off.

86.     The *Wall Street Journal* further reported that "Honda and Takata discovered more problems. At Moses Lake, employees had switched off a mechanism that automatically checked whether the right amount of propellant was loaded in inflators; at a plant in Monclova, Mexico, a dehumidifier that kept parts dry hadn't been turned on. At times, poor record-keeping meant Honda and Takata couldn't figure out which cars had defective bags."

87.     Honda's and Takata's ongoing cover-up and ineffective recalls continued to cost lives. In December 2009, a 2001 Honda Accord driven by Gurjit Rathore, 33, hit a mail truck in Richmond, Virginia. Her air bag exploded, propelling shrapnel into her neck and chest, and she bled to death in front of her three children, according to a lawsuit filed by her family.

88.     In February 2010, only months after its previous recall, Honda announced a third recall for an additional 379,000 vehicles across a number of models ("2010 Recall"). Honda's explanation for the airbag defects changed yet again. Honda explained that of the two different manufacturing processes used in the preparation of an airbag propellant, one process was within specification and the other was not. Honda's expanded recall supposedly reached those vehicles employing airbags that had utilized manufacturing processes not within specification.

89.     Once again, injuries continued to mount:

   a.   In April 2010, two months after the 2010 Recall, the Takata airbag in Kristy Williams's 2001 Honda Civic exploded while she was stopped at a traffic light in Morrow, Georgia, sending metal shards into her neck and causing profuse bleeding. She survived only because she applied pressure with her fingers to stem the arterial bleeding.

   b.   On November 8, 2010, Suetania Emmanuel of St. Croix, U.S. Virgin Islands, was driving a 2002 Honda Civic when the Takata airbag exploded and sent metal fragments into her face and throat.

90.     In April 2011, Honda filed a Part 573 Defect and Noncompliance report for 2,430 replacement service part airbag modules that might have been installed in vehicles covered by previous recall expansions ("2011 Recall"). Honda was unable to determine which vehicles contained the defective replacement parts, forcing it to recall all 833,277 vehicles that might

have had the part installed.

91.     According to documents submitted with the 2011 Recall, on August 15, 2011, Honda became aware of an August 1, 2011, "energetic deployment of a driver's airbag inflator that was outside of the prior range of suspect inflators" On September 2, 2011, Honda and Takata began an analysis of these so-called "outside of range" occurrences.

92.     Underscoring Takata's ongoing quality control failures, on or about September 14, 2011, Honda and Takata began investigating the possibility that airbag inflator propellant lots were mixed during airbag inflator assembly, prompting further analysis of airbag inflator production records for the period when propellant was processed by the suspect method.

93.     Honda reported its death and injury tallies to regulators only in a confidential submission in December 2011, when it issued a fifth limited recall for the rupture defect, according to NHTSA. That recall expanded Recall No. 11V-260 (April 2011), to include an additional 272,779 Honda and Acura vehicles. The expanded recall also included another 640 airbags sold as replacement parts; however, because Honda could not determine on which vehicles the 640 replacement air bags were installed, an additional 603,241 vehicles had to be recalled. Collectively, 1.7 million Honda and Acura vehicles had been recalled by the end of 2011 because they contained Takata-manufactured airbags.

94.     In the meantime, Honda and Takata quietly continued their internal investigation into the Inflator Defect. According to Honda, an exploding airbag in Puerto Rico in October 2011 prompted Honda to ask permission from NHTSA to collect "healthy" airbag modules to see if "abnormal combustion was possible." The collection began on March 14, 2012, and by November 21, 2012, Honda in fact found that even its so-called "healthy" airbags could abnormally combust in certain conditions.

95.     Notably, in or about December 2012, NHTSA's Office of Defects Investigation ("ODI") notified Honda that there were numerous injury or death incidents listed on a spreadsheet Honda provided to NHTSA in connection with NHTSA's Takata investigation that were *not* previously provided to NHTSA under the early warning reporting system established by the TREAD Act. In late 2014, Honda ultimately admitted that it failed to report 1,729 serious accidents resulting in injuries or deaths to NHTSA between 2003 and 2014. Eight of these incidents involved Takata airbags. In January 2015, Honda agreed to pay a $70 million fine for this startling failure.

96.     Toyota also received additional direct notice of the Inflator Defect in this timeframe. Starting in September 2012, Toyota received field reports of three U.S. vehicles with fractured inflators—two were front passenger side airbags that deployed inadvertently. Toyota recovered 144 in-use inflators from both the Japan and US markets for Takata to evaluate. In February 2013, Takata informed Toyota that some of the propellant wafers found within the recovered inflators were cracked, possibly due to lower material density.

97.     Dangerous incidents continued to mount during this period.

   a.   On April 20, 2011, an unidentified man was hurt in Puerto Rico when the Takata driver airbag ruptured in his 2001 Honda Accord LX. His attorney notified NHTSA on May 26, 2011.

   b.   On September 20, 2011, Eddie Rodriguez crashed his Honda Civic in Puerto Rico, deploying airbags that launched sharp pieces of metal toward him. Honda reached a confidential settlement with the driver in 2013.

   c.   On October 20, 2011, there was an alleged rupture of a passenger side airbag in Puerto Rico; Honda obtained the vehicle for analysis on February 3, 2012.

d.  On December 4, 2011, Miranda Perez suffered left eye blindness due to a Defective Airbag rupture while driving her 2003 BMW M3 in Buffalo, New York.

e.  On March 2, 2012, Angelina Sujata suffered chest injuries due to a Takata airbag rupture while driving her 2001 Honda Civic in Chapin, South Carolina.

f.  On March 8, 2012, Sharonda Blowe of Jacksonville, Florida was severely injured while driving a 2001 Honda Accord when she was struck in the head by pieces of metal exploding out of a Defective Airbag. Ms. Blowe brought suit and reached a confidential settlement.

g.  On September 2, 2012, Monique Roig suffered facial injuries due to a Defective Airbag rupture while riding in a 2001 Honda Civic in Miami-Dade County, Florida.

98.  By 2013, it became clear that the defective airbag issue was far more widespread than Takata or Honda initially reported to NHTSA.

99.  On February 8, 2013, NHTSA and Honda met to discuss the "ongoing investigation" into Honda's defective Takata airbags. By March 6, 2013, Honda had learned that:

> A recreation of propellant production using the same methods as were used during 2001-2002 production periods indicated that it was possible for propellant produced during 2001-2002 to be manufactured out of specification without the manufacturing processes correctly identifying and removing the out of specification propellant. Separately, Honda was informed by the supplier of another potential concern related to airbag inflator production that could affect the performance of these airbag modules.

100.  In February and March 2013, Takata notified Nissan and **Mazda** that it was investigating airbag quality. Separately, Takata advised Honda "of another potential concern

related to airbag inflator production that could affect the performance of these airbag modules."

101.    On April 10, 2013, Honda filed a Recall Notification ("2013 Recall") for an additional 561,422 vehicles that could be affected by the following part defect:

> In certain vehicles, the passenger's (frontal) airbag inflator could produce excessive internal pressure. If an affected airbag deploys, the increased internal pressure may cause the inflator to rupture. In the event of an inflator rupture, metal fragments could be propelled upward toward the windshield, or downward toward the front passenger's foot well, potentially causing injury to a vehicle occupant.

102.    On April 11, 2013, Takata filed a Defect Information Report titled "Certain Airbag Inflators Used as Original Equipment" ("Takata DIR"). In that report, Takata described the defective airbags as follows:

> Some propellant wafers produced at Takata's plant in Moses Lake, Washington, between April 13, 2000 and September 11, 2002 may have been produced with an inadequate compaction force. . . . In addition some propellant wafers used in inflators produced at Takata's plant in Monclova, Mexico between October 4, 2001 and October 31, 2002, may have been exposed to uncontrolled moisture conditions. Those wafers could have absorbed moisture beyond the allowable limits . . . . In both cases, the propellant could potentially deteriorate over time due to environmental factors, which could lead to over-aggressive combustion in the event of an air bag deployment. This could create excessive internal pressure within the inflator, and the body of the inflator could rupture.

103.    It was not until its April 2013 Report that Takata finally admitted that the defective inflators were installed as original equipment in vehicles manufactured by companies other than Honda, including Toyota, Nissan, **Mazda**, and BMW. Takata did not know, however, how many inflators were installed as original equipment in vehicles manufactured by companies other than Honda.

104.    In April 2013, based on Takata's new admissions, six major automakers, including Nissan, **Mazda**, BMW, Pontiac, and Honda, issued recalls of 3.6 million vehicles containing Takata airbags.

105.    With the increased awareness and scrutiny, news of incidents became more widespread:

a.  On August 5, 2013, Joseph Nasworthy of Jacksonville, Florida, suffered severe lacerations to his eye and nose when the Takata airbag exploded upon deployment in his 2005 Honda Civic.

b.  On September 1, 2013, Stephanie Erdman of Destin, Florida, was driving a 2002 Honda Civic when she was hit in the eye by shards of metal that shot from the Takata airbag. Ms. Erdman filed suit and reached a confidential settlement.

c.  Also in September 2013, when police got to the scene of a minor car accident in Alhambra, California, they thought the driver, Hai Ming Xu, had been shot in the face. In fact, he was killed by shrapnel exploding from the Takata airbag in his 2002 Acura TL that deployed when it hit the wall of a building. As *The New York Times* reported:

> The authorities have not determined a reason for the injuries, though his coroner's report cited tears in his airbag and facial trauma from a foreign object. And problems persist with Honda's reporting of potential defects.
>
> In at least four more recent suspected ruptures, including the one linked to [the California driver's] death, Honda has not filed a so- called early warning report with safety regulators, as is required in cases where there is a claim of defect that resulted in an injury or death, according to case lawyers and legal filings.

d.  On October 12, 2013, Brandi Owens of Forsyth County, Georgia was injured in a

low-speed accident when the driver-side Takata airbag of her 2013 Chevy Cruze exploded and detached from the steering wheel. According to a lawsuit, metal from the airbag hit Owens in the face and left her blind in one eye.

106.   By 2014, the incident rate picked up even more dramatically. In 2014 and 2015, there have been over a dozen incidents involving injury or fatalities in Nissan, Honda, Toyota, Chevy, and **Mazda** vehicles, taking place in a variety of regions in the country, from humid Puerto Rico to far drier Massachusetts and California. For example:

a.   On February 19, 2014, a Takata passenger airbag ruptured and sprayed metal fragments at the passenger following a crash in a 2007 Chrysler 300.

b.   On February 20, 2014, a Takata airbag ruptured due to ejected metal fragments following an accident in a 2003 Dodge Ram 1500, causing the airbag to collapse and fail in its purpose of cushioning the driver from impact. The driver suffered severe physical injury as a result.

c.   On March 14, 2014, Susan Cosgrove of Fremont, California was injured in a low-speed accident while driving a 2013 Chevy Cruze. The Takata-related recall notice on her car arrived at her residence after the incident.

d.   On May 29, 2014, Corey Burdick of Eustis, Florida, was driving a 2001 Honda Civic when the airbag deployed and sent shards of metal into his eye.

e.   In June 2014, a low-speed accident involving a 2005 Honda Accord in Los Angeles, California, caused the car's driver airbag to "detonate," sending hot metal and plastic shrapnel into the cabin.

f.   On October 6, 2016, a Takata airbag ruptured and expelled pieces of metal shrapnel that penetrated into the driver's face, slicing his entire face from the left

side of his mouth extending to his left eyebrow.

107.    With accidents proliferating, Takata met with NHTSA officials on May 20, 2014 to provide information about inflator ruptures not covered by previous recalls. At that meeting, Takata noted that "all six of the potentially-relevant rupture incidents had occurred in either Florida or Puerto Rico." The referenced incidents include both passenger and driver side airbags. This statement omitted one of the earliest incidents, Ms. Weaver's 2003 accident in Arizona, as well as later incidents in drier locales, as noted above.

108.    On June 11, 2014, NHTSA's ODI published an ODI Resume for a preliminary evaluation of Investigation No. PE 14-016. That document stated that NHTSA was opening an investigation "in order to collect all known facts from [Takata] and the vehicle manufacturers that it believes may have manufactured vehicles equipped with inflators produced during the same period as those that have demonstrated rupture events in the field."

109.    Also on June 11, 2014, Takata informed NHTSA that it "believes that an [sic] number of the inflators identified above were provided to the following vehicle manufacturers for use in vehicles sold in the United States (the manufacturers are listed in alphabetical order): BMW, Chrysler, Ford, Honda, **Mazda**, Nissan, and Toyota." Takata's June 11, 2014 letter further stated:

> If we determine that any of those inflators were sold to other vehicle manufacturers, we will let you know promptly. Takata is not certain which models or model years of vehicles are equipped with the subject inflators, and it does not know how many of those vehicles were sold in or are registered in the States to be covered by the requested field actions. That information will need to be obtained from the affected vehicle manufacturers. (Emphasis added).

110.    On June 20, 2014, Honda issued additional recalls for a total of nearly 4.5 million Honda and Acura vehicles that contained defective Takata airbags.

111.    By the end June 2014, the number of vehicles that had been recalled due to defective Takata airbags had increased to over 6 million. Vehicle manufacturers, however, had still not recalled all of the vehicles containing Defective Airbags.

112.    On July 8, 2014, Honda expanded a "two million vehicle air bag recall by as many as one million more vehicles in California." *The New York Times* reported that "[a] defective inflator could explode in a crash, sending shards of its metal casing into the passenger compartment. The inflator was made by Takata Corporation, which has said the propellant inside the inflator was not properly prepared and was too powerful."

113.    On August 18, 2014, *The New York Times* reported that NHTSA had "deepened" its investigation of Honda's airbags: "Federal regulators have intensified an investigation into the inadvertent deployment of side air bags on 2008 Honda Accords," as they were "concerned that the side air bags along the outer edges of the ceiling and the seats may deploy when a door is slammed."

114.    In August 2014, Honda issued yet another recall of Honda and Acura vehicles, "its ninth for the defect - bringing to six million the total of recalled Honda and Acura vehicles"

115.    The tragic pattern of mounting casualties in the face of Defendants' sluggish response continued:

      a.    On July 7, 2014, Claribel Nunez of Hialeah, Florida, suffered severe wounds to her forehead from shrapnel that exploded out of a Takata airbag in her 2001 Honda Civic.

      b.    On August 17, 2014, a Takata airbag ruptured after an accident in a 2007 Ford Mustang, deploying with abrupt force and ejecting a metal fragment into the driver's leg. Ford was notified of the incident.

c. On October 2, 2014, Florida resident Hien Tran died, four days after her 2001 Honda Accord struck another car in Orlando and the Takata airbag exploded, sending shrapnel into her neck. The medical examiner stated that the shrapnel tore through the airbag, hitting Ms. Tran and causing "stab-type wounds" and cutting her trachea. Indeed, her death was initially investigated as a homicide by detectives. A week after she died, she received a letter in the mail from Honda urging her to get her car fixed because of faulty airbags that could explode.

116. On October 22, 2014, NHTSA expanded the recall list to cover ten automakers and 7.8 million vehicles, over 5 million of which were Hondas. In a Consumer Advisory dated October 22, 2014, NHTSA sent an urgent warning to the owners of the now "7.8 million Affected Vehicles":

> The National Highway Traffic Safety Administration urges owners of certain Toyota, Honda, Mazda, BMW, Nissan, Mitsubishi, Subaru, Chrysler, Ford and General Motors vehicles to act immediately on recall notices to replace defective Takata airbags. Over seven million vehicles are involved in these recalls, which have occurred as far back as 18 months ago and as recently as Monday. The message comes with urgency, especially for owners of vehicles affected by regional recalls in the following areas: Florida, Puerto Rico, limited areas near the Gulf of Mexico in Texas, Alabama, Mississippi, Georgia, and Louisiana, as well as Guam, Saipan, American Samoa, Virgin Islands and Hawaii.

117. On October 29, 2014, NHTSA sent letters to ten automakers regarding the safety risks posed by the Takata airbags. The letter stated that "[t]he ongoing cooperation of all manufacturers who have recalled vehicles is essential to address this safety risk," and that the "NHTSA team is engaged with you in critical work to better understand the failures and take action to remedy the safety risk." NHTSA's letter also asked the automakers to provide NHTSA with information as to their recall process, urged a faster response from them, and stated that

"more can and should be done as soon as possible to prevent any further tragedies."

118.    On October 30, 2014, NHTSA ordered the airbag supplier Takata to turn over documents and answer questions under oath related to defective airbag inflators. The order demanded that Takata turn over records related to the production, testing and  subsequent concerns raised internally and by automakers over the airbags, as well as communications between the company and automakers about defect concerns

119.    Also on October 30, 2014, NHTSA's ODI published an ODI Resume for Investigation No. AQ 14-004. That document stated that NHTSA had opened an investigation "in order to investigate the extent and scope of Honda's reporting failures, as well as the reason(s) for such failures and the steps being taken by Honda to assure full compliance with TREAD reporting requirements."

120.    On November 3, 2014, NHTSA issued another Special Order, this time demanding documents from Honda to determine what and when the company knew about deaths and injuries caused by Takata's airbags.

121.    The U.S. Department of Justice is also investigating whether Takata misled U.S. regulators about the number of defective airbags it sold to automakers, including Toyota and Honda. On November 13, 2014, the United States District Court for the Southern District of New York issued a federal grand jury subpoena to Takata and Honda.

122.    By November 18, 2014, it was clear to NHTSA that even the extensive recalls to date were insufficient. NHTSA therefore demanded a national recall of Chrysler, Ford, Honda, **Mazda**, and BMW vehicles with certain driver airbags made by Takata. It simultaneously issued its second Special Order to Takata compelling it to provide, under oath, documents and detailed information on the propellant used in Takata's inflators. At a hearing of the United States Senate

Committee on Commerce on November 20, 2014, Takata Senior Vice President Hiroshi Shimizu refused to support a national recall.

123.    Takata reiterated its refusal at a hearing before the U.S. House of Representatives Energy and Commerce Subcommittee on December 3, 2014, claiming there was "not enough scientific evidence" to support a national recall. Yet, as NHTSA Administrator David Friedman stated, "when we saw real-world incidents on the driver side, one in California, we pushed Honda to make sure that their recall covered that region. Then very recently, we came aware of a driver side incident in North Carolina. With six total incidents, two of which are outside that region, we can no longer support a regional recall. Our policy is clear: Recalls must be nationwide unless the manufacturers can demonstrate that they are regional. With the new data, it is clear they can no longer demonstrate that the region that was used before was appropriate for driver side airbags."

124.    The geographic scope of the incidents undermined Takata's focus on humidity as the defining contributor to the dangerous ruptures. As Mr. Friedman explained, "[o]ne of the most frustrating parts about this is that neither the automakers nor Takata have been able to get to the bottom of the root cause on this. We have been pushing them to do so."

125.    As of the December 3, 2014 House hearing, Honda, Ford, Chrysler, and Toyota had all agreed to NHTSA's demand for a nationwide recall, principally for driver side airbags. Days later, **Mazda** expanded the geographic scope of its recall. By December 23, BMW had also agreed to a nationwide recall.

126.    Having neglected the defect for over a decade, the 10 vehicle manufacturers met in December 2014 to "sort out a way to understand the technical issues involved." A few months later, in March 2015, Honda announced an advertising campaign to promote the recall—a step it

could and should have taken a decade ago. A few days later, Honda announced another 105,000 vehicles that needed to be recalled (Recall 15V153), consisting of vehicles that should have been part of the 2014 recalls.

127.    Frustrated by Takata's continual foot-dragging, NHTSA imposed a $14,000 per day fine that started on Friday, February 20, 2015, concluding that Takata had not been forthcoming with the information that it is legally obligated to supply, nor cooperative in aiding NHTSA's ongoing investigation. Days later, NHTSA demanded that Takata preserve all airbag inflators removed through the recall process as evidence for both NHTSA's investigation and private litigation cases.

128.    In the meantime, the risk of injury remains very real, exacerbated by automakers' poor execution of the recalls, as discussed in the next section.

    a.   On June 25, 2014, Patricia Mincey was rendered quadriplegic due to a Takata airbag rupture while driving her 2001 Honda Civic in Jacksonville, Florida.

    b.   On July 22, 2014, Joshua Reliford suffered severe facial and brain injuries due to a Takata airbag rupture while driving his 2001 Honda Civic in McCraken County, Kentucky.

    c.   On July 28, 2014, Francisco Demarco died due to a Takata airbag rupture while riding in the passenger seat of a 2007 Honda Accord in Palm Beach County, Florida.

    d.   On October 4, 2014, Devon Rideout suffered permanent loss of vision due to an alleged Takata airbag rupture while riding passenger in a 2001 BMW 330i in Chesapeake City, Virginia.

    e.   On November 19, 2014, Racquel Hudson suffered extensive first and second

degree burns due to a Takata airbag rupture while driving her 2004 Honda Odyssey in San Antonio, Texas.

f.    On December 12, 2014, the driver airbag in a 2002 BMW 325 parked in the owner's driveway deployed with such energy that it melted and burned the dashboard and ceiling panel, created burn marks throughout the cabin,  and shattered the front windshield.

g.    On December 31, 2014, the Takata driver airbag in a 2008 Mazda6 deployed following an accident, ejecting metal fragments that injured the driver's face.

h.    On January 18, 2015, Carlos Solis was killed in an accident in Houston, Texas, and a ruptured Takata airbag was the suspected cause.

129.    For more than 15 years, Takata knew there was a problem with the safety of its airbags, as there have been at least 14 deaths and 139 injuries linked to defective Takata airbags. As detailed above, the incidents date back to at least 2003, and involve vehicles made by Acura, BMW, Chevrolet, Honda, **Mazda**, Subaru, and Toyota.

130.    Each of the Mazda Defendants knew of the Inflator Defect by virtue of these incidents and the investigations conducted by NHTSA, Takata, and the other vehicle manufacturers.

131.    The Mazda Defendants were on further notice due to unusual Takata airbag deployments that should have prompted further inquiry into the airbags' fitness for use. A review of publicly-available NHTSA complaints shows dozens of incidents of Takata airbags inadvertently deploying in vehicles, an event that, on information and belief, could be tied to the unstable propellant. These complaints started as early as September 2005, and involve vehicles manufactured by Acura, BMW, Dodge, Ford, Mitsubishi, Pontiac, Subaru, and Toyota. Some of

these incidents showed still further signs of the Inflator Defect, including airbags that deployed with such force that they caused the windshield to crack, break, or shatter, and others that caused unusual smoke and fire (or both). For example:

a.  Takata airbags inadvertently deployed and caused windshields to crack, shatter, or break in a 2004 Mitsubishi Lancer on November 23, 2006, a 2003 Toyota Corolla on May 3, 2010, a 2003 Toyota Matrix on August 17, 2010 (in addition to causing unusual smoke), and a 2003 Toyota Matrix on January 29, 2012 (in addition to damaging the dashboard).

b.  Takata airbags inadvertently deployed and caused unusual smoke and heat in a 2003 Acura MDX on January 29, 2012 (which caused the driver skin burns) and a 2003 Toyota Corolla on March 17, 2014.

### F.  Mazda's Particular Knowledge of the Inflator Defect

132.  In addition to the facts alleged above, the Mazda Defendants had direct knowledge of Takata's Inflator Defect with respect to Mazda vehicles as early as 2002.

133.  In February 2002, two Takata airbag inflators ruptured and exploded at Mazda's testing facilities. The Mazda Defendants reported both events to Takata and, in both cases, Takata determined the cause of the defect was related to its use of ammonium nitrate as the propellant.

134.  Beginning in 2008, the Mazda Defendants finally started to investigate what they already knew regarding the Inflator Defect. In an internal email dated December 3, 2008, one of the Mazda Defendants' engineers responsible for the design and development of Mazda's airbags, Masafumi Sakakida, forwarded to other Mazda employees a report of airbag rupture events occurring in Mazda Atenza vehicles (same model as the Mazda 6 sold in the United

States). In this email, Mr. Sakakida noted, "[M]any are with the Takata-made airbags."

135.    In a series of internal emails dated January 29, 2009, Mr. Sakakida and other Mazda employees discuss more Takata airbag rupture events occurring in Mazda Atenza vehicles.

136.    By 2009, the Mazda Defendants knew about the Honda recall, that there was a defect involving Takata's use of ammonium nitrate as the airbag propellant, and that the Inflator Defect had resulted in death or injury to seven people.

137.    Over the following years, more and more Mazda vehicles experienced airbag rupture events involving the Inflator Defect. For example:

      a.    In 2011, the Mazda Defendants learned of an airbag rupture event involving a PSDI-4 inflator in a Mazda vehicle that was directly attributed to the Inflator Defect.

      b.    In 2012, another Mazda vehicle experienced an airbag rupture event.

      c.    On April 26, 2014, Dorothy Gravlin suffered severe injuries and hearing loss when the airbag in her Mazda 6 exploded and ruptured following a collision at 25 MPH.

138.    On March 21, 2013, in response to an inquiry the Mazda Defendants made to Takata, Takata informed the Mazda Defendants that the airbag inflators the Mazda Defendants were using and installing in their vehicles contained ammonium nitrate and were therefore susceptible to the Inflator Defect.

139.    Despite knowing about the Inflator Defect present in their vehicles, the Mazda Defendants opted to continue to use and install Takata's defective airbags in Mazda vehicles because these airbags saved $2.00 per vehicle. Indeed, through official corporate policies, the

Mazda Defendants continuously emphasized "the pursuit of cost" as the primary factor driving their procurement of component parts for its vehicles, including Takata's airbags.

140.    Despite knowing about the Inflator Defect present in their vehicles, the Mazda Defendants did not issue their first recall until April 10, 2013. Even then, the Mazda Defendants limited their recall to a mere 149 vehicles, notwithstanding their knowledge that the Inflator Defect was present in hundreds of thousands of Mazda vehicles.

141.    The Mazda Defendants slowly continued to roll out limited recalls over the years, including in June 2014, October, 2014, January 2015, and June 2015 to include more vehicles. In fact, the Mazda Defendants continue to recall vehicles affected by the Inflator Defect to this day, notwithstanding that the Inflator Defect has been known in Mazda vehicles for almost 15 years. On October 23, 2018, the Mazda Defendants recalled another 156,000 Mazda vehicles known to suffer from the Inflator Defect.

142.    The lethargic pace and limited scope of the Mazda Defendants' recalls over the years has been determined exclusively by cost rather than consumer safety. Internal documents and emails show that the Mazda Defendants were well aware that hundreds of thousands of Mazda vehicles were affected by the Inflator Defect, but were purposefully not included in their initial recalls. In these internal documents and emails, the Mazda Defendants confirm that their reasoning for not including certain affected Mazda vehicles was based on the costs involved in recalling and repairing these vehicles.

143.    In an email dated January 9, 2015, the Mazda Defendants discussed their limited recalls and astonishingly admitted: "As much as we all would like to expeditiously launch recall programs for each and every concern that is justified, this does not always happen due to costs and financial funding available. Regarding resources of time and headcount, we run very lean on

available engineers to follow-up on each and every safety defect concern."

144.     The Mazda Defendants' recalls will presumably continue into the future; meanwhile, the Mazda Defendants' consumers will continue to be unknowingly exposed to Takata's deadly airbags solely because the Mazda Defendants do not want to incur the costs associated with an adequately robust recall.

### G.     Mazda's Lengthy Delay in Recalling the Subject Vehicle and Failure to Notify Plaintiff of the Recall

145.     The Mazda Defendants have been slow to investigate the defective Takata airbag systems, and have likewise continuously delayed initiating and carrying out recalls of Mazda vehicles known to include the defectively dangerous Takata airbag systems. Their conduct with respect to the Subject Vehicle is a case in point.

146.     As noted above, the Mazda Defendants began by recalling an extremely narrow set of its vehicles outfitted with Takata airbag systems in 2013. The initial miniscule recall was expanded over time due to increasing scrutiny and a swell of Mazda drivers being wounded by Takata airbag systems, with Mazda announcing recalls year after year covering more of the Mazda vehicles on the road.

147.     Although the Mazda Defendants began recalling vehicles with Takata airbag systems in 2013, Defendants did not first recall the Subject Vehicle until more than four years (and numerous recalls) later, on July 28, 2017, in NHTSA Recall Number 17V-474 (the "**474 Recall**"). Before the 474 Recall, the Mazda Defendants undertook several regional and nationwide recalls between 2013 and 2017 of Mazda vehicles to address the Inflator Defect linked to Takata airbag systems—present in the Subject Vehicle—and each time failed to recall the Subject Vehicle despite knowledge of the dangerous defect.

148.    The 474 Recall unquestionably related to the Takata airbag system, as it warned the "<u>driver</u> front air bag may explode in the event of a crash that causes the air bag to deploy; even a minor crash." *See* https://www.nhtsa.gov/recalls?nhtsaId=17V474 (last visited Feb. 3, 2021) (emphasis added).

149.    The Mazda Defendants did not notify Broxton of the 474 Recall, and Broxton did not otherwise learn of the 474 Recall from other sources.

150.    Then, on June 15, 2018, Mazda initiated another recall which included the Subject Vehicle, NHTSA Recall Number 18V-402 (the "**402 Recall**"). The 402 Recall likewise related to Takata airbag systems, but this time warned that the "<u>passenger</u> front air bag may explode in the event of a crash." *See* https://www.nhtsa.gov/recalls?nhtsaId=18V402 (last visited Feb. 3, 2021) (emphasis added).

151.    The Mazda Defendants did not notify Broxton of the 402 Recall, and Broxton did not otherwise learn of the 402 Recall from other sources.

152.    Because of the Mazda Defendants' failure to act with reasonable care in carrying out its recall of Mazda vehicles containing Takata airbag systems (including, without limitation, the 474 Recall and 402 Recall), Broxton did not know of the dangerous condition in the Subject Vehicle at the time of the Incident. Additionally, Broxton did not know of the dangerous condition during the period of the use of the Subject Vehicle before the Incident. Had Broxton been informed at any time before driving or riding in the Subject Vehicle of the potentially lethal defect in the airbag system, he would not have used the Subject Vehicle, and, accordingly, he would not have been exposed to said defective and unreasonably dangerous condition.

## TOLLING OF THE STATUTE OF LIMITATIONS

153.    The causes of action alleged herein did not accrue until Plaintiff discovered that the Subject Vehicle had the defective airbag—after the subject Incident. Plaintiff, however, had no realistic ability to discern that the Subject Vehicle was defective until – at the earliest – after the defective airbag exploded. Even then, Plaintiff had no reason to discover his causes of action because of Defendants' active concealment of the true nature of the airbag inflator defect, untimely recall notice, and failure to act with reasonable care in executing the eventual recall campaign.

## CONDITIONS PRECEDENT

154.    All conditions precedent have been satisfied or excused.

## COUNT I—NEGLIGENCE
### (Against Mazda Motor Corporation)

155.    Broxton re-alleges and incorporates Paragraphs 1 through 154 of this Complaint as if fully stated herein.

156.    Mazda Motor Corporation ("**MMC**") is engaged in the business of selling or otherwise distributing products, including the Subject Vehicle.

157.    MMC knew or in the exercise of due care should have known that the Subject Vehicle with its incorporated Takata airbag safety system would be used without inspection in an unreasonably dangerous condition and would create a foreseeable and unreasonable zone of risk of harm to users, including Plaintiff.

158.    In 2013, MMC voluntarily undertook to recall Mazda vehicles containing defective Takata airbag systems. In so doing, MMC assumed a duty to act with reasonable care in its performance of the Takata recall effort.

159.    Between 2013 and 2017, MMC undertook successive under-inclusive recalls of Mazda vehicles containing dangerously defective Takata airbag systems, and each recall failed to include the Subject Vehicle despite MMC's knowledge that the Subject Vehicle contained the Inflator Defect.

160.    MMC breached its duty by negligently failing to recall the Subject Vehicle as part of its recall campaign between 2013 and 2017.

161.    Mazda Motor Corporation finally recalled the Subject Vehicle due to its dangerously defective Takata airbag systems in 2017 (the 474 Recall) and 2018 (the 402 Recall). By voluntarily undertaking the 474 Recall and 402 Recall, MMC assumed a duty to act as a reasonable person in recalling the Subject Vehicle.

162.    MMC breached its duty by failing to use reasonable means available in carrying out the 474 Recall and 402 Recall, as follows:

   a.   Failing to ensure the defective Airbag Safety System in the Subject Vehicle was fixed, repaired, or made safe in a reasonable and timely manner pursuant to the recalls of the Subject Vehicle by MMC pursuant to the Safety Act; and

   b.   Failing to ensure timely notification (and, indeed, failing to ensure *any* notification to Broxton) and completion of the repair of the Airbag Safety System in the Subject Vehicle upon voluntarily undertaking the duty to do so, including, specifically the initiation of MMC's safety improvement campaign(s).

163.    The negligence described above, inclusive of the conduct, actions and inactions as addressed in the preceding portions of this Complaint as have been specifically incorporated and re-alleged, directly and proximately caused the injuries of Plaintiff, in that it directly and in natural and continuous sequence, produced or contributed substantially to Plaintiff's injuries.

164.    Plaintiff suffered personal injuries including (a) bodily injury and any resulting pain and suffering, disability or physical impairment, disfigurement, mental anguish, inconveniences or loss of capacity for the enjoyment of life, experienced in the past or to be

experienced in the future; (b) the expense of hospitalization, medical and nursing care and treatment necessarily or reasonably obtained in the past or to be so obtained in the future; and (c) any earnings or working time lost in the past and any loss of ability to earn money in the future.

165.   The conduct of MMC was not simply negligent, but amounted to intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of (a) the protracted period of time over which the defects have existed, (b) the long held knowledge of the defects by Mazda Motor Corporation (c) the repeated failure to take adequate steps to notify the public or federal regulators of the danger, and (d) the repeated efforts by Mazda Motor Corporation to minimize the seriousness and scope of the problem.

**WHEREFORE**, Plaintiff, Robert Lee Broxton, demands judgment against Defendant, Mazda Motor Corporation, for all injuries and damages he sustained due to the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, and interest, and for any such further relief as the Court deems appropriate.

## COUNT II—NEGLIGENCE
### (Against Mazda Motor of America, Inc.)

166.   Broxton re-alleges and incorporates Paragraphs 1 through 154 of this Complaint as if fully stated herein.

167.   Mazda Motor of America, Inc. ("**MMA**") is engaged in the business of selling or otherwise distributing products, including the Subject Vehicle.

168.   MMA knew or in the exercise of due care should have known that the Subject Vehicle with its incorporated Takata airbag safety system would be used without inspection in an unreasonably dangerous condition and would create a foreseeable and unreasonable zone of risk of

harm to users, including Plaintiff.

169.    In 2013, MMA voluntarily undertook to recall Mazda vehicles containing defective Takata airbag systems. In so doing, MMA assumed a duty to act with reasonable care in its performance of the Takata recall effort.

170.    Between 2013 and 2017, MMA undertook successive under-inclusive recalls of vehicles containing dangerously defective Takata airbag systems, each of which failed to include the Subject Vehicle despite MMA's knowledge that the Subject Vehicle contained the Inflator Defect.

171.    MMA breached its duty by negligently failing to recall the Subject Vehicle as part of its recall campaign between 2013 and 2017.

172.    MMA finally recalled the Subject Vehicle due to its dangerously defective Takata airbag systems in 2017 (the 474 Recall) and 2018 (the 402 Recall). By voluntarily undertaking the 474 Recall and 402 Recall, MMA assumed a duty to act as a reasonable person in recalling the Subject Vehicle.

173.    Mazda Motor Corporation breached its duty by failing to use reasonable means available in carrying out the 474 Recall and 402 Recall, as follows:

 a.  Failing to ensure the defective Airbag Safety System in the Subject Vehicle was fixed, repaired, or made safe in a reasonable and timely manner pursuant to the recalls of the Subject Vehicle by MMA pursuant to the Safety Act; and

 b.  Failing to ensure timely notification (and, indeed, failing to ensure *any* notification to Broxton) and completion of the repair of the Airbag Safety System in the Subject Vehicle upon voluntarily undertaking the duty to do so, including, specifically the initiation of MMA's safety improvement campaign(s).

174.    The negligence described above, inclusive of the conduct, actions and inactions as addressed in the preceding portions of this Complaint as have been specifically incorporated and re-alleged, directly and proximately caused the injuries of Plaintiff, in that it directly and in

natural and continuous sequence, produced or contributed substantially to Plaintiff's injuries.

175.    Plaintiff suffered personal injuries including (a) bodily injury and any resulting pain and suffering, disability or physical impairment, disfigurement, mental anguish, inconveniences or loss of capacity for the enjoyment of life, experienced in the past or to be experienced in the future; (b) the expense of hospitalization, medical and nursing care and treatment necessarily or reasonably obtained in the past or to be so obtained in the future; and (c) any earnings or working time lost in the past and any loss of ability to earn money in the future.

176.    The conduct of MMA was not simply negligent, but amounted to intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of (a) the protracted period of time over which the defects have existed, (b) the long held knowledge of the defects by Mazda Motor Corporation (c) the repeated failure to take adequate steps to notify the public or federal regulators of the danger, and (d) the repeated efforts by Mazda Motor Corporation to minimize the seriousness and scope of the problem.

**WHEREFORE**, Plaintiff, Robert Lee Broxton, demands judgment against Defendant, Mazda Motor of America, Inc., for all injuries and damages he sustained due to the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, and interest, and for any such further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff, Robert Lee Broxton, demands a jury trial on all issues so triable.

Dated: February 23, 2021

/s/ Emily Jeffcott
**EMILY JEFFCOTT, ESQ.**
Texas Bar No. 24069993
**Morgan & Morgan, P.A.**
220 West Garden Street, 9th Floor
Pensacola, FL 32502
Telephone: (850) 316-9074
Email: ejeffcott@forthepeople.com
Secondary Email: kdimeglio@forthepeople.com
*Counsel for Plaintiff*

*-And-*

**ANDREW PARKER FELIX, ESQ.**
Florida Bar No.: 0685607
(*pro hac vice* application forthcoming)
**BRANDEN WEBER, ESQ.**
Florida Bar No.: 124283
(*pro hac vice* application forthcoming)
**JOSHUA R. JACOBSON, ESQ.**
Florida Bar No.: 1002264
(*pro hac vice* application forthcoming)
**Morgan & Morgan, P.A.**
20 North Orange Avenue, Suite 1600
Orlando, FL 32801
Telephone: (407) 244-3209
Email: afelix@forthepeople.com
Secondary Email: kdimeglio@forthepeople.com
Secondary Email: bweber@forthepeople.com
Secondary Email: jjacobson@forthepeople.com
*Counsel for Plaintiff*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on February 23, 2021, the foregoing document was electronically filed with the Clerk of Court for the Western District of Texas, Austin Division, by using the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record.

<u>*/s/ Emily Jeffcott*</u>